**In re JANDOUS ELECTRIC CONSTRUCTION CORP., Debtor.**

**Bankruptcy No. 88 B 20680.**

United States Bankruptcy Court, S.D. New York.

June 5, 1990.

As Corrected June 13, 1990.

trust fund payments, (2) has made unauthorized repayments to Union Trust Company ("Union Trust") which holds a lien on the debtor's assets, and (3) has made unauthorized repayments of superpriority and secured claims held by MacLean Grove & Co., Inc. ("MacLean Grove"), the debtor's parent corporation. Slattery contends that the repayments were for the benefit of MacLean Grove, and the debtor's president, Robert Bierman, because they guaranteed the debtor's obligations to Union Trust. Slattery argues that only Union Trust and MacLean Grove will benefit from a confirmation of the debtor's liquidation plan because the debtor used trust funds received from Slattery to make repayments to Union Trust and MacLean Grove, with the result that Slattery was compelled to assume the debtor's liability to subcontractors who supplied work and materials and held liens against the job on which the debtor was a subcontractor and Slattery was the general contractor.

Sidney Turner, P.C., White Plains, N.Y., for debtor.

Pullman, Comely, Bradley & Reeves, Bridgeport, Conn., for Union Trust Company Bank; Stephen Sakonchick, II, of counsel.

Berman, Paley, Goldstein & Berman, and Dreyer and Traub, New York City, for Slattery Associates, Inc.

## DECISION ON OBJECTIONS TO CONFIRMATION OF DEBTOR'S PROPOSED FIRST AMENDED PLAN OF ARRANGEMENT

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor, Jandous Electric Construction Corp., has filed a liquidating Chapter 11 plan which provides for the sale of all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims, pursuant to 11 U.S.C. § 1129(a)(4). A creditor, Slattery Associates, Inc. ("Slattery"), has objected to the confirmation of debtor's liquidation plan on the grounds that (1) the debtor has diverted

### FINDINGS OF FACT

1. On December 1, 1988, the debtor, Jandous Electric Construction Corp., filed with this court a voluntary petition for reorganizational relief under Chapter 11 of the Bankruptcy Code. Thereafter, the debtor continued to manage its property and conduct business as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. The debtor is a New York Corporation engaged in the electrical contracting business. MacLean Grove, a Maryland corporation, holds 50% of the stock of the debtor. Union Trust is a Connecticut banking organization and holds a secured claim against the debtor which was originally $1.5 million and was reduced to $400,000.00. The claim of Union Trust is secured by a lien on all the debtor's property.

3. Slattery is the debtor's largest unsecured creditor, having filed a proof of claim for $4,973,000.00, for damages arising out of the debtor's breach of a subcontract, dated November 11, 1986, pursuant to which Slattery was the general contractor under a public improvement contract with

the New York City Transit Authority. Slattery's claim includes in excess of $947,-908.00 of trust claims under Article 3–A of the New York Lien Law for monies that Slattery paid to the debtor's vendors and materialmen. Slattery has filed proofs of claim and notices of assignments of proof of claims for monies it paid to various of the debtor's suppliers on the debtor's behalf.

4. The debtor's liquidating Chapter 11 plan proposes to fully pay all administration claims and priority claims in cash. The secured claim held by Union Trust will be paid under the plan in a reduced amount. Although impaired, Union Trust has accepted the debtor's plan. MacLean Grove, which holds a superpriority claim under 11 U.S.C. § 507(b) for cash collateral which was advanced pursuant to court order, although not adequately protected, has also consented to the debtor's liquidating plan. The debtor has not obtained the consent of the impaired class holding general unsecured claims because Slattery, which is the holder of the largest unsecured claim against the debtor, has not consented to the liquidation plan and has objected to its confirmation.

5. Because this is a liquidation plan whereby the debtor will discontinue operations after confirmation, and because there are no governmental regulatory agencies involved or any retirement plans affected and all fees payable under 28 U.S.C. § 1930 will be paid, it follows that the following subsections of 11 U.S.C. 1129(a) are not implicated: (4), (5), (6), (7), (9), (11), (12) and (13).

6. Subsection (10) of 11 U.S.C. § 1129(a) is not in issue because despite the lack of acceptance by the impaired class of holders of unsecured claims, the plan will satisfy 11 U.S.C. § 1129(b)(2)(B)(ii) in that the absolute priority test will be met due to the fact that no claims or interests junior to the unsecured creditors will receive or retain any property. The shareholders will receive nothing following the liquidation of the debtor.

7. Accordingly, Slattery's objection to confirmation is addressed to the first three subsections of 11 U.S.C. § 1129(a), which are as follows:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

8. Slattery's objection to confirmation is stated as follows:

The Proposed Amended Plan cannot be confirmed because it fails to satisfy the requirements of 11 U.S.C. section 1129(a): (a) it fails to satisfy Slattery's trust claims that must be paid in full before any estate claims can be paid; (b) Jandous violated an order of this Court and paid down its pre-petition secured obligation to Union Trust Company ("Union Trust") to circumvent its principals' liability to Union Trust; (c) the estate has apparently paid various personal obligations of its principals; (d) Jandous has paid down two apparently pre-petition unsecured obligations; (e) Jandous' operating statements and/or disclosure statement contain inaccurate financial information; and (f) Jandous failed to comply with Bankruptcy Rule 2002(b).

*The Diversions of Funds Argument*

9. On August 29, 1986, Slattery, as a general contractor, entered into a contract with the New York City Transit Authority for $50,000,000.00 in renovations and improvements to the Prospect Avenue elevated subway line ("Construction Contract"). This project called for the installation of new signal equipment, electrical repairs and electrical distribution to twenty-six stations. The project also included rehabilitation of three pump rooms and pumping systems in the East River tunnels to prevent leaking and flooding.

10. Pursuant to a subcontract between the debtor and Slattery, dated November 18, 1986, the debtor agreed to perform electrical work for the project as a subcontractor for an approximate amount of $13 million, in accordance with the terms of the

subcontract. Paragraph 4 of the subcontract required the debtor, as subcontractor, to complete the work within the time limit specified in the general contract for the project and in accordance with the Transit Authority's specifications.

11. Paragraph 3 of the subcontract between the debtor and Slattery provided that, from time to time as and when payments were received by Slattery from the Transit Authority, Slattery would make progress payments to the debtor for work, labor, services and materials incorporated in place during the preceding month by the debtor, as subcontractor, less 5% as a retainer. Final payment, including the 5% retainer, was to be paid to the debtor within ten days after final payment was made by the Transit Authority to Slattery.

12. In January 1987, Jandous commenced its work under the $13 million subcontract for Slattery, which was the general contractor under the $50 million Construction Contract with the Transit Authority. During that year, Slattery submitted requisitions to the Transit Authority for work performed on the project. The Transit Authority made progress payments to Slattery for work and materials furnished to the project. Slattery, in turn, made progress payments to its subcontractors, including the debtor, for their participation in the project. According to its figures, Slattery made payments pursuant to the debtor's subcontract exceeding $7,000,-000.00. Jandous had spent $8,791,154.00 on the job through November 10, 1988.

13. On December 1, 1988, the debtor filed with this court its petition for Chapter 11 relief, under the Bankruptcy Code, and continued in business as a debtor in possession in accordance with 11 U.S.C. § 1108.

14. On December 7, 1988, the debtor's representatives and Slattery's representatives attended a meeting at Slattery's business office. The debtor informed Slattery that it had filed a Chapter 11 petition because it was experiencing cash flow problems. The debtor's representative, Norman Nadel, said that he was sorry for this situation because he knew that Slattery would be hurt through no fault of its own. However, Mr. Nadel said that the debtor needed an additional $1½ million to continue performance under the contract. Mr. Nadel also informed Slattery that it owed substantial amounts to suppliers who had furnished materials under the debtor's subcontract. Mr. Nadel rejected Slattery's suggestion that the debtor should reduce its work force to ease its cash flow problems because if the workers were laid off it would be difficult to get them back to the job. Mr. Nadel said that the debtor was not prepared to finish the work under the subcontract and that the debtor could not continue in business along the same path. Nadel also concluded that it would cost more to complete the subcontract than the agreed upon $13 million subcontract price. The parties agreed to another meeting to review the figures.

15. On December 19, 1988, the parties held a second meeting at Slattery's offices. Mr. Nadel submitted an analysis of the cost to complete the subcontract which reflected that it would cost the debtor approximately $4½ million over the $13 million subcontract price. Mr. Nadel once again reiterated Jandous' need for an additional $1½ million to continue work pursuant to the subcontract.

16. At the December 19, 1988 meeting, Mr. Nadel informed Slattery that he learned that Slattery had received progress payments from the Transit Authority in the sum of $1,032,373.94 under the subcontract for work performed by the debtor in October and November of 1988. Mr. Nadel then requested payment from Slattery for this sum. Slattery refused to make any payments to the debtor for the months of October and November, 1988 on the ground that Slattery was informed that the debtor had ordered materials for the job in excess of $636,000.00 for which the suppliers were not paid. Additionally, Slattery had advanced $258,300.00 as reflected by a check dated November 9, 1988 to Westinghouse Electric Supply Company for two massive switching gears and appurtenances which the debtor had ordered for the project. It had been agreed between Slattery and the debtor that the $258,300.00 payment would

be deducted from the current estimated contract price. Moreover, Slattery was concerned that it would sustain substantial damages if the debtor could not complete its performance under the subcontract.

17. During the period following the December 7, 1988 meeting between the parties, Slattery requested that the debtor stay on the job and perform certain emergency work that had to be completed in December. For this work, which was done on a time and materials basis, Slattery paid the debtor $235,677.05.

18. The debtor ceased doing any work under the subcontract on December 23, 1988. Thereafter, the debtor did not return to the job site and did no further work to complete the subcontract.

19. Slattery learned that the debtor had not paid its suppliers for materials installed at the project in the billed amount of $636,-890.39. Additionally, the debtor failed to pay for materials fabricated for the project and in Jandous' possession in the sum of $137,670.03. Slattery also learned that there were mechanics' liens filed against the project in the sum of $854,799.71, as a result of the debtor's failure to pay suppliers for materials sold for use in the project.

20. Having failed to perform any work on the New York City Transit project after December 7, 1988 and having abandoned the project after December 23, 1988, this court found that the debtor had breached its contract with Slattery and was not entitled to receive from Slattery any progress payments for the work it performed in October and November of 1988, on the theory that the contract contemplated that the debtor would be compensated for a completed contract and not on the basis of divisible units.

21. Accordingly, this court held on March 24, 1989, that the debtor could not recover the $1,032,373.94 claimed for work, labor and materials furnished to the New York City Transit project under its subcontract with Slattery.

22. Thus, while Slattery had made payments to the debtor under the subcontract of approximately $7,472,929.29, the debtor had spent approximately $8,391,154.00 on the job through November 30, 1988. At Slattery's request the debtor stayed on the job for a few weeks after December 7, 1988 to perform emergency work, for which Slattery paid the debtor $235,677.05. Therefore, the debtor spent approximately $682,547.66 more than it received from Slattery for the project.

23. Having spent more than it received for the New York City Transit Project, it follows that the debtor did not retain any trust funds which could be diverted towards payment of Union Trust's secured obligation, which was guaranteed by the debtor's insiders. The so-called trust res was expended before the debtor filed its Chapter 11 petition.

24. Because the debtor had no operating funds after it filed its Chapter 11 petition, and in view of the fact that Union Trust, which holds a lien on all the debtor's assets for advances in excess of $1 million, was unwilling to advance any additional funds as cash collateral, the debtor had to seek operating funds from its parent corporation, MacLean Grove.

25. In addition to the unpaid bills incurred by the debtor, which Slattery must satisfy in order to complete the project, it will cost Slattery another $4½ million to complete the contract according to the debtor's own figures. Based upon these facts, Slattery estimates that it will sustain damages of at least $2,874,607.00 by reason of the debtor's failure to perform the subcontract as agreed.

26. The MacLean Grove superpriority loan was necessary in order to finance the debtor's continued operations. Unsecured credit was not available to the debtor from outside sources, nor could the debtor borrow funds as an administration expense. Therefore, its corporate parent, MacLean Grove, was willing to provide up to $850,-000.00 if given priority over all administration expenses in accordance with 11 U.S.C. § 364(c)(1). This loan was authorized pursuant to this court's order dated April 21, 1989. The order expressly provides that the "Debtor may not use the [MacLean Grove] superpriority loan proceeds to re-

duce the principal of the Debtor's obligation to Union Trust Company."

27. The funds advanced by MacLean Grove provided the debtor with operational funds to continue its performance under other contracts which were profitable and which the debtor had not abandoned as it did Slattery in the case of the Slattery subcontract.

28. During the course of the debtor's post-petition operations it continued to liquidate assets included under Union Trust's secured lien. Nearly $900,000.00 was received by the debtor from the liquidation of Union Trust's collateral in 1989. These funds were remitted to Union Trust together with other funds for a total repayment in 1989 in the sum of $1.1 million. The specific repayments to Union Trust and the dates were as follows:

| | | |
|---|---|---|
| May | 16, 1989 | $ 400,000.00 |
| June | 15, 1989 | 200,000.00 |
| July | 17, 1989 | 200,000.00 |
| August | 1, 1989 | 100,000.00 |
| August | 3, 1989 | 100,000.00 |
| August | 16, 1989 | 100,000.00 |
| | Total ..... | $1,100,000.00 |

29. If the debtor's parent corporation, MacLean Grove, had not furnished the $850,000.00 cash collateral to the debtor for its operational purposes the debtor would not have been able to continue its operations, including the liquidation of assets and the completion of other contracts. Therefore, although the MacLean Grove loan proceeds were not turned over to Union Trust in violation of the cash collateral order, the availability of these funds to the debtor enabled it to continue in business and to pay down the Union Trust secured indebtedness with funds that were not restricted by the cash collateral order.

30. Although the transfers to Union Trust were not authorized by this court pursuant to 11 U.S.C. § 549, the debtor does not seek to avoid such transfers because Union Trust was fully secured and was threatening to seek relief from the stay to foreclose on its collateral. Union Trust originally held a secured claim of $1.5 million. With the debtor's consent, Union Trust's secured claim has been reduced $1.1 million pursuant to the debtor's liquidation program with the result that Union Trust presently holds a secured claim of approximately $400,000.00.

## DISCUSSION

The two significant points advanced by Slattery in opposing confirmation of the debtor's Chapter 11 liquidation plan relate to the debtor's alleged violation of Article 3-A of the New York Lien Law by diverting trust funds and the debtor's contravention of this court's order dated April 21, 1989, which authorized a superpriority loan from the debtor's parent corporation, MacLean Grove, but which directed the debtor not to use the loan proceeds to reduce the debtor's obligation to Union Trust.

In order to confirm a Chapter 11 plan, a debtor must satisfy 11 U.S.C. § 1129(a)(3) which requires that a plan be "proposed in good faith and not by any means forbidden by law." The term "law" in this provision includes state law. *In re Acequia, Inc.*, 787 F.2d 1352, 1360 (9th Cir.1986); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir.1984). Thus, the proposal of the Chapter 11 plan must comply with all applicable law, not merely bankruptcy law. In this case, Slattery contends that the debtor violated Article 3-A of the New York Lien Law by using trust funds intended for the payment of laborers and materialmen with respect to a public improvement project for the purpose of repaying its secured obligation to Union Trust in order to minimize the personal guarantees of the debtor's insiders.

Article 3-A of the New York Lien Law provides in relevant part in Section 70(1) that trust funds received "by a contractor ... or received by a subcontractor under or with a subcontract made with the contractor for ... public improvement of real property ... or, public improvement ... shall constitute assets of a trust for the purpose provided in section Seventy-one of this Chapter." One of the purposes enumerated in Section 71 involves the "payment of claims of subcontractors, architects, engineers, surveyors, laborers and materialmen." The purpose of these provi-

sions is to safeguard rights of persons participating in construction projects by requiring that contractors and subcontractors act as the fiduciary manager of the fixed amounts provided for construction operations. *Ingalls Iron Works Co. v. Fehlhaber Corp.*, 337 F.Supp. 1085 (S.D.N.Y. 1972); *Harman v. Fairview Associates*, 25 N.Y.2d 101, 302 N.Y.S.2d 791, 250 N.E.2d 209 (1969); *In re Grosso*, 9 B.R. 815 (Bankr.N.D.N.Y.1981). The funds received by the contractor or subcontractor may be commingled with their general funds, but must first be applied to the payment of the statutory suppliers, laborers and materialmen beneficiaries. *Aquilino v. United States*, 10 N.Y.2d 271, 219 N.Y.S.2d 254, 176 N.E.2d 826 (1961).

In the instant case, the debtor applied all the funds it received from Slattery to the public improvement project, and more. It received $7,472,929.29 from Slattery and expended $8,791.154.00 towards the project. Because the debtor breached and abandoned the public improvement project, Slattery was not required to pay the debtor $1,031,373.94 for labor and materials furnished by the debtor under the contract for October and November, 1988. Therefore, the debtor was deprived of these funds which it could have applied towards its performance at the public improvement project. However, in view of the fact that the express language in Section 70(1) of Article 3–A of the New York Lien Law imposes a fiduciary duty upon both the general contractor and the subcontractor with respect to public improvement contracts, Slattery applied some of the withheld funds towards the payment to the laborers and materialmen to the extent of $927,429.69. Therefore, Slattery satisfied its fiduciary obligation imposed under Article 3–A of the New York Lien Law and is subrogated to the extent of these payments pursuant to 11 U.S.C. § 509(c). Although the statutory beneficiaries were compensated by Slattery, it does not follow that the debtor has diverted statutory trust funds because it did not pay these beneficiaries. Obviously, the debtor did not have the funds to pay the laborers and materialmen at the New York City Transit project because Slattery withheld the funds after the debtor abandoned the contract. Although Slattery's payment to the beneficiaries increased its unsecured claim against the debtor, it also satisfied Slattery's fiduciary obligation imposed under Article 3–A of the New York Lien Law in addition to fulfilling Slattery's obligation to the New York City Transit Authority under its general contract.

### The MacLean Grove Superpriority Loan

Slattery maintains that the debtor's Chapter 11 liquidation plan is part and parcel of a design to reduce the liability of the debtor's parent corporation, MacLean Grove, and its president, Robert Bierman, under the guarantees which they gave in connection with the Union Trust secured loan. Hence, Slattery reasons that the debtor's liquidation plan is not proposed in good faith. The good faith of a Chapter 11 plan must be viewed in light of the totality of the circumstances surrounding confirmation. *Sandy Ridge Development Corporation v. Louisiana National Bank (In re Sandy Ridge Development Corp.)*, 881 F.2d 1346, 1353 (5th Cir.1989), *reh'g. denied*, 889 F.2d 663 (5th Cir.1989); *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142, 1160 (5th Cir.1988), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988); *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir.1984). In the instant case, the fact that the debtor's parent corporation, MacLean Grove, was authorized to furnish operating funds up to $850,000.00 to enable the debtor to continue operations under other contracts and to liquidate Union Trust's secured collateral does not mean that the debtor acted in bad faith by reducing Union Trust's secured obligation of $1.5 million to $400,000.00. The reduction of a secured claim, especially in light of a proposed liquidation plan, does not affect the interests of unsecured claims. *See In re Dave Noake, Inc.*, 45 B.R. 555, 557 (Bankr.D.Vt.1984) (11 U.S.C. § 549 is not violated by the payment of a secured claim).

Manifestly, MacLean Grove could have made payments directly to Union Trust in reduction of its guaranteed liability. However, this approach would not have afforded the debtor an opportunity to continue its operations and complete other contracts which brought in additional income. Moreover, there was no proof that the MacLean Grove loan proceeds were paid directly to Union Trust. The evidence supports the fact that the MacLean Grove loan proceeds were used for the purpose of supporting the debtor's business operations, which is specifically authorized under 11 U.S.C. § 364(c)(1) when a debtor is unable to obtain unsecured credit allowable as an administrative expense of the kind specified in 11 U.S.C. § 503(b). The fact that the MacLean proceeds freed up other funds which were used to reduce the secured claim of Union Trust through the liquidation of assets and the application of proceeds from other operations does not mean that the debtor's liquidation plan is not in good faith. If the debtor's liquidation plan is not confirmed and the case is converted for liquidation under Chapter 7 of the Bankruptcy Code, the Union Trust secured claim will still have priority over Slattery's unsecured claims.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A).

2. The debtor has not diverted statutory trust funds for nontrust purposes in violation of Sections 70(1) and 71 of Article 3–A of the New York Lien Law.

3. The debtor's Chapter 11 plan of liquidation has been proposed in good faith and not by any means forbidden by law as required under 11 U.S.C. § 1129(a)(3).

4. The debtor's Chapter 11 plan of liquidation complies with 11 U.S.C. § 1129(a) §§ (1), (2), (3), (4), (7), (9), (10) and (12).

5. The class of unsecured claims, including objecting creditor Slattery, which is impaired and has not consented to the plan, will receive or retain on account of such claims property of a value, as of the effective date of the plan, equal to the allowed amount; or the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, as required pursuant to 11 U.S.C. § 1129(b)(2)(B)(i) and (ii).

6. The debtor's Chapter 11 plan of liquidation shall be confirmed.

SETTLE ORDER on notice.